IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

JUANITA J. SHAW, )
 )
       Plaintiff, )
 )
v. ) Case No. CIV-06-506-KEW
 )
MICHAEL J. ASTRUE, )
Commissioner of Social )
Security Administration, )
 )
       Defendant. )

**OPINION AND ORDER**

Plaintiff Juanita J. Shaw (the "Claimant") requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Claimant's application for disability benefits under the Social Security Act. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, it is the finding of this Court that the Commissioner's decision should be and is REVERSED and REMANDED.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See*, 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1164

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally,* <u>Williams v. Bowen</u>, 844 F.2d 748, 750-51 (10th Cir. 1988).

(10th Cir. 1997)(citation omitted). The term "substantial evidence" has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); *see also*, Casias, 933 F.2d at 800-01.

### Claimant's Background

Claimant was born on October 21, 1958 and was 47 years old at the time of the ALJ's decision. She completed her GED. Claimant previously worked as a habilitation training specialist and aircraft worker. Claimant alleges an inability to work beginning July 30, 2004 due to fibromyalgia, connective tissue disorder, collagen vascular disorder, hypothyroidism, lumber degenerative disk disease, type II diabetes, irritable bowel syndrome, overactive bladder, complications from a fractured ankle,

3

respiratory problems, headaches, insomnia, impaired vision, depression, and anxiety. Claimant's insured status expires on December 31, 2009.

**Procedural History**

On August 10, 2004, Claimant protectively filed for disability benefits under Title II of the Social Security Act (42 U.S.C. § 401, *et seq*.). Claimant's application for benefits was denied initially and upon reconsideration. On January 24, 2006, Claimant appeared at a hearing before ALJ Lantz McClain in McAlester, Oklahoma. By decision dated May 12, 2006, the ALJ found Claimant was not disabled at any time through the date of the decision. On September 20, 2006, the Appeals Council denied Claimant's request for review. As a result, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. He found Claimant retained the residual functional capacity ("RFC") to perform jobs in the national and regional economies of cashier, administrative support person, and assembler.

**Errors Alleged for Review**

Claimant asserts the ALJ committed error requiring reversal in (1) failing to properly evaluate the opinions of Claimant's

4

treating and examining physicians; and (2) reaching an RFC determination which is not supported by substantial evidence.

### Consideration of the Treating Physician's Opinions

Claimant contends the ALJ failed to afford the appropriate weight to three treating or, at least, examining physicians' opinions. Claimant's relevant medical history begins in the record in 1998 where she received treatment for an eye injury. (Tr. 235-236). Thereafter, Claimant also received treatment and surgical intervention for a broken left ankle. (Tr. 200-204).

On March 26, 2002, Claimant received a positive antinuclear antibody ("ANA") test, possibly indicating lupus and was diagnosed with hypothyroidism. (Tr. 234). On September 3, 2002, Claimant was attended by Dr. Noel Emerson. He diagnosed Claimant with dysphagia, thyromegaly, high cholesterol, weight gain, and hypothyroidism. (Tr. 273). Dr. Emerson ordered a thyroid scan which revealed an area of decreased uptake at the upper pole of the right lobe which appeared significant. (Tr. 197).

On October 2, 2002, Claimant was diagnosed with hypothyroidism and anxiety for which she was prescribed Synthroid, Levoxyl, and Zoloft. (Tr. 271). On November 18, 2002, Claimant was again attended by Dr. Emerson after complaining of feeling "washed out," feeling like she can't get air, her skin felt burnt, and she could not sleep. (Tr. 265). Claimant had elevated hemoglobin, mean

corpuscular hemoglobin ("MCH"), Estradiol levels, and positive anti-DNA results. (Tr. 265-269).

On February 5, 2003, Claimant was attended by Dr. Grace Kennedy, a pulmonologist. Claimant complained of difficulty breathing. Dr. Kennedy diagnosed mild restrictive lung disease with minimal defect in the diffusion coefficient. Dr. Kennedy noted Claimant's possible exposure to tuberculosis. (Tr. 191-192).

On February 18, 2003, Claimant underwent a tuberculosis consultation with a health department physician. She was noted to have a granuloma and atelectasis in her left lung, elevated purified protein derivative results, and a productive cough. (Tr. 225). Claimant was diagnosed with inactive pulmonary tuberculosis, prescribed a course of tuberculosis medication and was approved for public contact. Id.

On March 27, 2003, Claimant's lab work showed elevated MCV and MCH but a low platelet count. (Tr. 224). As a result, Claimant returned to Dr. Emerson on April 7, 2003. Claimant complained of headaches, muscle aches and pains, spasms, dizziness, blurred vision, dry mouth, ringing in her ears, fatigue, and rash with burning pain. Claimant had high hemoglobin and MCH values. Claimant was prescribed Zoloft. (Tr. 261).

On April 15, 2003, Claimant again saw Dr. Emerson, complaining of burning pain in her back. Lab testing revealed high hemoglobin,

6

MCH, MCHC, hematocrit, creatinine kinase, low platelets, and negative ANA. (Tr. 256-259).

On July 21, 2004, Dr. Emerson authored a letter which stated Claimant suffered from "noninsulin dependent diabetes, hypothyroidism, familial tremors, myalgias and arthralgias and an undefined connective tissue disorder." As a result, Dr. Emerson stated his opinion that Claimant's condition "does not allow her to maintain gainful employment." (Tr. 240).

On October 22, 2003, Claimant presented to Dr. E.M. Sundaram, Jr., a neurologist. Claimant reported fatigue and stabbing pains in her legs and leg weakness, and intermittent blurred vision. Dr. Sundaram acknowledged Claimant's history of fibromyalgia and myopathy. He also noted Claimant's repeated elevated blood sugar levels. (Tr. 253). Claimant reported improvement in her condition to Dr. Emerson in November of 2003. (Tr. 248-250).

On December 30, 2003, Claimant underwent an MRI of her lumbar spine. The test showed mild facet arthrosis at L3-L4 with some very minimal disc space narrowing with desiccation and a mild broad based disc bulge. Disc desiccation was also found at L4-L5 with mild facet arthrosis. Desiccation was also noted at S1. (Tr. 275).

On January 26, 2004, Claimant was diagnosed by Dr. Emerson with overactive bladder, hypothyroidism, non-insulin dependent

7

diabetes, and chronic lower back pain. (Tr. 247).

On February 10, 2004, Claimant presented to Dr. R. J. Helton, complaining of blurry vision, headaches, a facial rash, bladder pressure, pain and weakness in the legs, and nausea. Claimant's face was swollen and had a rash. Her ANA was positive with high titer and speckled in appearance. A positive ANA with a speckled appearance can be associated with connective tissue disorder. Claimant was prescribed Deltasone. (Tr. 300-302). She returned to Dr. Helton the following day with similar complaints. Dr. Helton stated she needed to see an rheumatologist. (Tr. 299).

On March 5, 2004, Claimant was seen by Dr. Chris Codding, an orthopedist, complaining of lumbar back pain. Dr. Codding diagnosed Claimant with lumbar degenerative disc disease, prescribing Flexeril and Bextra. (Tr. 227-231).

On April 26, 2004, Claimant was again attended by Dr. Emerson, complaining of a rash on her face and back and boils. Dr. Emerson diagnosed Claimant with hypothyroidism, connective tissue disorder, non-insulin dependent diabetes, and boils. (Tr. 246).

On June 14, 2004, Claimant saw Dr. Emerson with increasing muscle weakness and fatigue in her lower extremities, a facial rash, and tremors in her right hand. Claimant's MCH, MCV, and MCHC levels were not normal. Dr. Emerson diagnosed non-insulin dependent diabetes, hypothyroidism, tremors, and myalgia and

arthralgia. (Tr. 241-245).

On June 21 and 23, 2004, Claimant was attended by Dr. Helton, reporting tremors and heaviness in her right hand and arm, as well as drawing of her arms and legs. Claimant was prescribed Baclofen. (Tr. 296-297).

On July 7, 2004, Claimant saw Dr. W. Dean Shipley, a neurologist. Dr. Shipley opined that Claimant likely suffered from fibromyalgia possibly intertwined with a collagen vascular dysfunction. (Tr. 237-239).

On July 20, 2004, Claimant saw Dr. Helton. He noted Claimant's complaint of hand and arm jerking. He also noted Claimant had drawing of the fingers down. He diagnosed Claimant with fibromyalgia, irritable bowel syndrome, diabetes, hypothyroidism, and insomnia. (Tr. 295).

On July 27, 2004, Dr. Helton authored a letter in which he identified Claimant's medical conditions as hypothyroidism, NIDDM, fibromyalgia, hyperlipidemia, insomnia, collagen vascular disease, and irritable bowel syndrome. He also noted Claimant's problems with tremors in her hands and right arm, which caused jerking and weakness. (Tr. 294).

On August 10, 2004, Dr. Sundaram wrote a letter stating Claimant suffered from problems with vision, trouble with generalized weakness, paresthesias, trouble with gait, problems

with speech, generalized fatigue and generalized myalgic type of pain. He further states Claimant "has been diagnosed as having possible fibromyalgia." Dr. Sundaram wrote "the patient continues to have significant and worsening problems with generalized fatigue, generalized muscle pain and tenderness, trouble with headaches, sleep problems, vision and speech." He concludes

> After evaluating her for a long time and looking at different neurological symptoms and differential diagnosis, it is my feeling that she most likely has fibromyalgia. Unfortunately, with fibromyalgia, one would expect a person to have persistent symptoms if not worse over a period of time. She is totally and completely disabled, is unable to work at any capacity because of this pain. She has attempted to continue to work in spite of these symptoms, but it has come to a point where she is really unable to do any type of work. The causes for her inability to work includes the fatigue as well as generalized muscle pain and tenderness. I consider her totally and completely disabled.

(Tr. 274).

Claimant continued to complain of pain in her legs and feet and tingling in her right upper extremity in visits to Dr. Codding on August 26, 2004. Dr. Codding diagnosed lumbar degenerative disc disease, significant leg pain, a history of rash with negative lupus serology, and possible nerve entrapment due to cervical disc disease. (Tr. 226).

On September 10, 2004, Claimant returned to Dr. Helton with tremors and drawing of her right hand, bloody stools, double vision, headache, and nausea. She was diagnosed with fibromyalgia

10

and irritable bowel syndrome. (Tr. 291).

On October 25, 2004, Claimant presented to Dr. Helton, complaining of pain at the base of her skull, weakness, and increasing tremors in her right hand. (Tr. 289).

On January 25, 2005, Claimant again saw Dr. Helton. He diagnosed Claimant with irritable bowel syndrome, noting bloating, constipation, shortness of breath, facial rash, and nausea. He also noted Claimant had uncontrollable tremors, spasms, and jerking of the fingers and hands. (Tr. 287). In visits in December of 2005 and January of 2006, Claimant complained of difficulty breathing, coughing, nausea, urinary frequency, and sharp pain in her hands and feet, for which she was prescribed additional Lortab. (Tr. 328-329).

On January 17, 2006, Dr. Helton wrote a letter concerning Claimant's condition. He stated Claimant suffered from fibromyalgia, with some elements of emphysema. He wrote she suffered from degenerative disease of the lumbar spine and hypothyroidism, has irritable bowel syndrome, and non-insulin dependent diabetes. Dr. Helton stated Claimant suffered a fracture of her left ankle and still experienced problems from that injury. He states Claimant appears to have connective tissue disorder, a positive ANA, urinary incontinence, numbness of the hands, feet and legs with tremors of the hands. He states Claimant is not

11

improved, has much fatigue, and has to rest frequently during the day by going to bed. He concludes with his belief that Claimant cannot be re-trained for other gainful employment due to her condition. (Tr. 331).

In his decision, the ALJ found Claimant suffered from severe impairments of L4-5 degenerative disc disease without central canal or foraminal stenosis, diabetes, hypothyroidism, status post surgically repaired left ankle, fibromyalgia, and inactive pulmonary tuberculosis with mild obstructive airway disease. (Tr. 27). However, he also concluded Claimant retained the RFC to perform a wide range of sedentary work. (Tr. 29).

With regard to the opinions of Dr. Emerson and Dr. Helton, the ALJ found they "are general treating physicians and not specialists. Their treatment has been conservative, consisting primarily of the prescribing of various medications." (Tr. 31). With regard to Dr. Sundaram, he finds that his diagnosis was only "possible fibromyalgia." He concludes that none of these physicians

> provided clinical support of their conclusions and did not indicate on what basis, if any, their treatment of the claimant would support such pessimistic conclusions. Their assessments seemed to be based upon the claimant's subjective complaints, which I do not find to be entirely credible. Their treatment records do not support their pessimistic assessments, and are therefore entitled to little weight.

(Tr. 31).

In deciding how much weight to give the opinion of a treating physician, an ALJ must first determine whether the opinion is entitled to "controlling weight." Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." Id. (quotation omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." Id. (quotation omitted). The factors reference in that section are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support

13

or contradict the opinion. Id. at 1300-01 (quotation omitted). After considering these factors, the ALJ must "give good reasons" for the weight he ultimately assigns the opinion. 20 C.F.R. § 404.1527(d)(2); Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004)(citations omitted). Any such findings must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." Id. "Finally, if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." Watkins, 350 F.3d at 1301 (quotations omitted).

The ALJ cited case authority in his decision which establishes the criteria for affording reduced weight to the opinion of a treating physician. However, he does not appear to have followed any of the authority in his complete rejection of these three treating doctors. Other than stating a subjective opinion that the physicians based their positions on Claimant's statements, the rejection is not justified as required by Watkins and its progeny. Admittedly, these physicians wrote letters that included conclusions as to Claimant's ability to work - conclusions which the ALJ was not bound to follow, since this determination is completely within the purview of the Commissioner's authority. 20 C.F.R. § 404.1527(e)(1). However, the analysis does not end with

14

this concession. The ALJ should still set forth in detail the basis for the reduced weight or, in this case, complete rejection of the treating physicians' opinions. Here, the ALJ subjectively states the treatment was conservative, without citing to medical authority for the conclusion. He also makes no mention of the connective tissue disorder referenced by Dr. Emerson, the positive ANA testing. On remand, the ALJ shall properly evaluate the treating physicians' opinions, all conditions for which Claimant has been diagnosed, and specifically cite any medical authority for not providing controlling weight to these opinions.

### The ALJ's RFC Evaluation

Claimant also contends the ALJ engaged in a flawed RFC evaluation. Specifically, Claimant alleges the ALJ should have included restrictions relating to her fatigue, pain, and handling and fingering capabilities, in light of the repeated diagnoses of tremors on her right side. Certainly, it appears from the ALJ's decision that he accepted the opinion of Dr. Shipley, a non-treating physician, on the issue of tremors over the opinions of Drs. Emerson, Helton, and Sundaram, Claimant's treating physician. Dr. Shipley determined the tremor to be "distractible." In re-evaluating the opinions of Claimant's treating physicians, he should also re-evaluate the effects of Claimant's diagnosed tremors and other conditions on her RFC.

15

**Conclusion**

The decision of the Commissioner is not supported by substantial evidence and the correct legal standards were not applied. Therefore, this Court finds the ruling of the Commissioner of Social Security Administration should be and is **REVERSED and the matter REMANDED** for further proceedings consistent with this Order.

DATED this 24th day of March, 2008.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE